UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                    :
ARTUR MACKOWIAK and BARBARA                         :
MACKOWIAK,                                           :        Case No.:
                                                    :
            Plaintiff,                               :        **COMPLAINT**
                                                    :
                                                    :        **DEMAND FOR JURY TRIAL**
    vs.                                              :
                                                    :
PORTOLA PHARMACEUTICALS, INC.,                       :
SCOTT GARLAND, HOLLINGS C.                           :
RENTON, JEFFREY BIRD, LAURA BREGE,                   :
DENNIS FENTON, JOHN H. JOHNSON,                      :
TED LOVE, DAVID C. STUMP, and H.                     :
WARD WOLFF,                                          :
                                                    :
            Defendants.                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiffs Artur and Barbara Mackowiak ("Plaintiffs"), by and through their attorneys,

allege the following upon information and belief, including investigation of counsel and review

of publicly-available information, except as to those allegations pertaining to Plaintiffs, which

are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiffs against Portola Pharmaceuticals, Inc.

("Portola" or the "Company") and the members of the Company's board of directors (collectively

referred to as the "Board" or the "Individual Defendants" and, together with Portola, the

"Defendants") for their violations of Sections 14(d)(4) and 14(e) of the Securities Exchange Act

of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), respectively, and United States

Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9 ("Rule 14d-9").

Plaintiffs' claims arise in connection with the proposed tender offer ("Tender Offer") by Alexion

1

Pharmaceuticals, Inc., a Delaware corporation ("Parent"), through its subsidiary Odyssey Merger

Sub Inc. ("Purchaser," and collectively with Parent, "Alexion"), to acquire all of the issued and

outstanding shares of Portola (the "Proposed Transaction").

2.      On May 5, 2020, Portola entered into an agreement and plan of merger, (the

"Merger Agreement"), whereby shareholders of Portola common stock will receive $18.00 in

cash for each share of Portola common stock they own (the "Offer Price").

3.      On May 27, 2020, in order to convince Portola's shareholders to tender their

shares, the Board authorized the filing of a materially incomplete and misleading Schedule 14D-

9 Solicitation/Recommendation Statement (the "Recommendation Statement") with the

Securities and Exchange Commission ("SEC").  In particular, the Recommendation Statement

contains materially incomplete and misleading information concerning: (i) the sales process; (ii)

the fairness opinion and financial analyses performed by the financial advisors to the Company,

Centerview Partners LLC ("Centerview" or the "Financial Advisors"); and (iii) certain financial

projections prepared by Portola and relied upon by the Financial Advisors.

4.      The Tender Offer is scheduled to expire one minute after 11:59 p.m., Eastern

Time, on July 1, 2020 (the "Expiration Date").  It is imperative that the material information that

has been omitted from the Recommendation Statement is disclosed to the Company's

shareholders prior to the forthcoming Expiration Date so they may make an informed

determination on whether to tender their shares.

5.      For these reasons, and as set forth in detail herein, Plaintiffs seek to enjoin

Defendants from closing the Tender Offer or taking any steps to consummate the Proposed

Transaction, unless and until the material information discussed below is disclosed to Portola's

shareholders or, in the event the Proposed Transaction is consummated, to recover damages

resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange

Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391 as Plaintiff alleges violations of Sections 14(d)(4)

and 14(e) of the Exchange Act.

7.      Personal jurisdiction exists over each Defendant either because the Defendant

conducts business in or maintains operations in this District, or is an individual who is either

present in this District for jurisdictional purposes or has sufficient minimum contacts with this

District as to render the exercise of jurisdiction over each defendant by this Court permissible

under the traditional notions of fair play and substantial justice.  "Where a federal statute such as

Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes

whether the party has sufficient contacts with the United States, not any particular state." *Sec.*

*Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has

minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over

the defendant in any federal district court." *Id*. at 1316.

8.      Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. §

78aa, as well as under 28 U.S.C. § 1391, because Defendants are found or are inhabitants or

transact business in this District.  Indeed, Portola's common stock trades on the Nasdaq stock

market (the "Nasdaq"), which is headquartered in this District, rendering venue in this District

appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting

cases).

**PARTIES**

9.      Plaintiffs are, and have been continuously throughout all times relevant hereto, the

3

owner of Portola common stock.

10.     Defendant Portola is a Delaware corporation and maintains its principal executive office at 270 East Grand Avenue, South San Francisco, California 94080.  Portola is a global biotechnology company focused on developing researching, developing, and commercializing treatments of serious blood-related disorders.  The Company's common stock trades on the Nasdaq under the ticker symbol "PTLA".

11.     Defendant Scott Garland ("Garland") is, and has been at all relevant times, the President and Chief Executive Officer and a director of the Company.

12.     Defendant Hollings C. Renton ("Renton") is, and has been at all relevant times, the Chair of the Board of Directors of the Company.

13.     Defendant Jeffrey Bird ("Bird") is, and has been at all relevant times, a director of the Company.

14.     Defendant Laura Brege ("Brege") is, and has been at all relevant times, a director of the Company.

15.     Defendant Dennis Fenton ("Fenton") is, and has been at all relevant times, a director of the Company.

16.     Defendant John H. Johnson ("Johnson") is, and has been at all relevant times, a director of the Company.

17.     Defendant Ted Love ("Love") is, and has been at all relevant times, a director of the Company.

18.     Defendant David C. Stump ("Stump") is, and has been at all relevant times, a director of the Company.

19.     Defendant H. Ward Wolff ("Wolff") is, and has been at all relevant times, a director

4

of the Company.

20.     The defendants identified in paragraphs 11-19 are collectively referred to as the "Individual Defendants" or the "Board."

## SUBSTANTIVE ALLEGATIONS

### A.  Background and the Unfair Offer Consideration

21.     Portola is a global biotechnology that develops and commercializes novel therapeutics in the areas of thrombosis, other hematologic diseases, and inflammation for patients who currently have limited or no approved treatment options.

22.     Portola's lead product is Andexxa [coagulation factor Xa (recombinant), inactivated-zhzo], which Portola markets in Europe under the brand name "Ondexxya."  Andexxa is the first and only antidote approved by the U.S. Food and Drug Administration (the "FDA") and the European Commission ("EC") for patients treated with rivaroxaban or apixaban, when reversal of anticoagulation is needed due to life-threatening or uncontrolled bleeding.

23.     Prior to the Alexion merger, Portola was marketing Betrixaban under the trade name Bevyxxa, an oral anticoagulant drug which acts as a direct factor Xa inhibitor that has been approved by the FDA to help prevent blood clots in adults hospitalized for acute medical illness who are at risk for thromboembolic complications due to restricted mobility and other risk factors.

24.     Prior to the Alexion merger Portola was also conducting clinical trials with Cerdulatinib, an investigational oral, dual spleen tyrosine kinase ("SYR") and Janus kinase ("JAK") inhibitor to treat hematologic cancers.

25.     Portola was founded in 2003 and went public with the issuance of its Initial Public Offering in May 2013.

21.    Portola has been successful since going public and the Company continues to be well-positioned for continued growth.   Indeed, although Portola's trading price dropped significantly when the Company released its fiscal 2019 fourth quarter and full-year financial results in late February 2020, its February 26, 2020 press release entitled *Portola Pharmaceuticals Reports Fourth Quarter and Full-Year 2019 Financial Results and Provides Corporate Update* assured the investing public that the Company as poised for sustained future growth, stating in part:

> "2019 was a year of significant accomplishments for Portola with the launch of our Gen 2 formulation of Andexxa in the United States and the approval and launch of Ondexxya in Europe. ***In 2020 we have several catalysts that we expect to drive further adoption and growth worldwide***," said Scott Garland, Portola's president and chief executive officer. "This includes the presentation of new clinical data, enhanced education and support related to reimbursement, the initiation of our urgent surgery study, and continued execution of the Ondexxya launch in Europe. Combined with the robust growth in the Factor Xa inhibitor market and our other strategic initiatives, ***we are confident that Andexxa has significant long-term growth potential***."

22.    Indeed, on the February 26, 2020 conference call accompanying the release of these financial results, Garland explained that he was "excited about our long-term growth opportunity" and was "confident that Andexxa will continue to grow in 2020 and beyond," noting that "Andexxa is poised for significant growth" because: (i) Andexxa "is a novel product, addressing the unmet need in a large and growing market," (ii) Portola would have "multiple opportunities to further increase the use of this important medicine through traditional label indications and geographic expansions," and (iii) "with the genericization of the Factor Xa inhibitor market, starting in 2023, there will be even greater need for a specific FDA approved reversal agent for this increased patient population."

23.    Garland further explained that Portola was "laser focused on driving near-term revenue growth," and had made the strategic decisions to "streamline" its plans to support Andexxa

and Ondexxya by: (i) reducing spend on early stage and development programs in order to focus

its resources on the Andexxa revenue drivers and lifecycle management, (ii) discontinuing its

efforts to commercialize Bevyxxa, and (iii) postponing the forthcoming trials for Cerdulatinib

pending securing a partner.

24.     Thus, the Proposed Transaction comes at a time when the Company's recent and

future success was not fully reflected by its share price, and the Proposed Transaction will cash-

out Portola's stockholders at a price that fails to adequately compensate them for the intrinsic value

of their shares.

25.     Despite Portola's intrinsic value and exceptional growth prospects, the Individual

Defendants are agreeing to sell the Company and deprive its stockholders of the ability to partake

in the Company's future growth.  The Individual Defendants breached their fiduciary duties owed

to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Offer

Consideration, and by allowing the unfair and flawed sales process to unfold in the manner that it

did, which has caused Plaintiffs and the Class to receive an inadequate Offer Consideration.

B.      **The Proposed Transaction**

26.     On May 5, 2020, Alexion and Portola announced the Proposed Transaction in a

Press Release entitled *Alexion to Acquire Portola*, which stated in part:

> BOSTON & SOUTH SAN FRANCISCO, Calif.—(BUSINESS WIRE)—Alexion
> Pharmaceuticals, Inc. (NASDAQ:ALXN) and Portola Pharmaceuticals, Inc.
> (NASDAQ:PTLA) announced today that they have entered into a definitive
> merger agreement for Alexion to acquire Portola, a commercial-stage
> biopharmaceutical company focused on life-threatening blood-related disorders.
> Portola's commercialized medicine, Andexxa® [coagulation factor Xa
> (recombinant), inactivated-zhzo], marketed as Ondexxya® in Europe, is the first
> and only approved Factor Xa inhibitor reversal agent, and has demonstrated
> transformative clinical value by rapidly reversing the anticoagulant effects of
> Factor Xa inhibitors rivaroxaban and apixaban in severe and uncontrolled
> bleeding. The acquisition will add near-term diversification to Alexion's

7

commercial portfolio and provides the opportunity to apply the company's demonstrated global commercial excellence to create long-term value for patients and shareholders. The merger agreement has been unanimously approved by the boards of Alexion and Portola.

"The acquisition of Portola represents an important next step in our strategy to diversify beyond C5. Andexxa is a strategic fit with our existing portfolio of transformative medicines and is well-aligned with our demonstrated expertise in hematology, neurology and critical care," said Ludwig Hantson, Ph.D., Chief Executive Officer of Alexion. "We believe Andexxa has the potential to become the global standard of care for patients who experience life-threatening bleeds while taking Factor Xa inhibitors apixaban and rivaroxaban. By leveraging Alexion's strong operational and sales infrastructure and deep relationships in hospital channels, we are well positioned to expand the number of patients helped by Andexxa, while also driving value for shareholders."

"In developing and launching Andexxa, Portola has established a strong foundation for changing the standard of care for patients receiving Factor Xa inhibitors that experience a major, life-threatening bleed. Andexxa rapidly reverses the pharmacologic effect of rivaroxaban and apixaban within two minutes, reducing anti-Factor Xa activity by 92 percent," said Scott Garland, President and Chief Executive Officer of Portola. "Given their enhanced resources, global footprint and proven commercial expertise, we look forward to working with Alexion to maximize the value of Andexxa. With their commitment to commercial excellence, together, we will be able to drive stronger utilization of Andexxa, increase penetration and accelerate adoption in the critical care setting."

**Transaction Details**

Under the terms of the merger agreement, a subsidiary of Alexion will commence a tender offer to acquire all of the outstanding shares of Portola's common stock at a price of $18 per share in cash. The tender offer is subject to customary conditions, including the tender of a majority of the outstanding shares of Portola common stock, the expiration or termination of the waiting period under the Hart-Scott Rodino Antitrust Improvements Act of 1976 and receipt of certain other regulatory approvals.

Following successful completion of the tender offer, Alexion will acquire all remaining shares not tendered in the offer at the same price of $18 per share through a merger. The transaction is expected to close in the third quarter of 2020.

Alexion will fund the transaction with cash on hand. As part of the acquisition, Alexion will also be acquiring cash currently on Portola's balance sheet, net of debt of approximately $215 million that will become due upon closing. As of December 31, 2019, cash and short-term investments were approximately $430 million. The actual amounts will be determined as of the transaction close.

RBC Capital Markets, LLC served as Alexion's exclusive financial advisor. Centerview Partners served as Portola's exclusive financial advisor. Cooley LLP served as Portola's legal advisor.

27.     Rather than continuing to build upon Portola's improving prospects, the Offer Consideration being offered to Portola's public shareholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of Portola common stock is materially in excess of the amount offered given the Company's recent financial performance and its prospects for future growth and earnings.

**C.     The Preclusive Deal Protection Devices**

28.     To the detriment of Portola shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

29.     The Merger Agreement contains a restrictive no-shop provision that prohibits the members of the Board from soliciting proposals relating to alternative offers or business combinations.

30.     The no-shop provision also prohibits, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to unsolicited proposals regarding alternative acquisitions or business combinations.

31.     Further, the Board must provide Alexion with written notice of any Takeover Proposal and must provide prior written notice of its intention to terminate the Merger Agreement in favor of any Superior Proposal so that Alexion has the opportunity to adjust the terms and conditions of the Merger Agreement so that the Takeover Proposal ceases to be a Superior Proposal.

32.     In addition, the Merger Agreement provides that the Company will be required to pay to Parent a termination fee of $51,500,000.00 to Alexion with respect to any termination under the no-shop provisions.

33.     Ultimately, these preclusive deal protection devices restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The aggregate effect of these preclusive deal protection devices, viewed in light of Portola's failure to engage in any meaningful outreach and the materially inadequate consideration offered for Portola shares in the Proposed Transaction, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

34.     Accordingly, Plaintiffs seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**D.     The Recommendation Statement Omits Certain Material Information**

**(i)     The Recommendation Statement Contains Materially False Statements and Omissions Regarding the Process by Which the Board Agreed to Sell the Company**

35.     On Page 16, the Recommendation Statement states that Portola had engaged in strategic discussions with potential strategic partners for a European License of Ondexxya, and "had discussions with several of such potential licensing partners, including Alexion," but that these discussions "ended in September 2019 when the Portola Board determined not to pursue a licensing partnership for Ondexxya."  However, the Recommendation Statement fails to disclose: (i) whether Portola executed any standstill agreements with one or more of these potential counterparties the possibility of which is contemplated on Page 40 of the Schedule TO Tender

Offer Statement, and if so, whether (ii) such standstill obligations contained "Don't Ask, Don't Waive" ("DADW") provisions.

36.    On Pages 17 though 18, the Recommendation Statement states that the Board directed Centerview to "contact a potentially interested industry participant (who had not participated in the process with respect to ex-U.S. Andexxa license opportunities in 2019) in order to explore whether there might be sufficient credible interest in a transaction with Portola" and decided not to engage other potential acquirors because, given "the lack of interest of the party Centerview contacted on March 3," the Board "determined that contacting additional potentially interested parties was unlikely to generate additional credible interest and the risks of outreach outweighed the potential benefits in light of the low likelihood of generating such interest." The Recommendation Statement fails to disclose: (i) why the only potential counterparty that the Board directed Centerview to contact with respect to a proposed transaction was a counterparty that had not participated in the Ondexxya licensing process, and (ii) whether the potential counterparty that the Board directed Centerview to contact provided a reason for its lack of interest and, if so, (iii) the reason that was provided.

37.    The Recommendation Statement fails to disclose the extent to which the Board discussed the "certain updates" to the "treatment in Centerview's financial analyses of obligations under certain royalty agreements" pursuant to which the obligations would be treated in a manner that would have significantly reduced Portola's net debt from $162 million net debt under Methodology 1 (the methodology that was employed during the negotiation of the Proposed Transaction) to $66 million net debt or $122 million in *net cash* under Methodologies 2 and 3, respectively.

    **(ii)**    **The Recommendation Statement Contains False Statements and Omissions Related to the Management Projections and the Fairness Opinion**

38.     The Recommendation Statement also omits material information regarding the Company's Financial Advisors' Fairness Opinion and the various valuation analyses that the Company's Financial Advisors performed to render the opinion because it does not provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness opinion.  Specifically, the Recommendation Statement does not disclose enough information regarding the financial projections, inputs and assumptions for various financial valuations, and the Financial Advisors' potential conflicts of interest.  Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Offer Price is fair, or accurately assess the reliability of the Fairness Opinion.  The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them.  Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

39.     With respect to the Management Projections, the Recommendation Statement fails to disclose material information.  With respect to these financial projections, directors are obligated to provide complete valuation metrics to shareholders, particularly in cash-out transactions where non-GAAP metrics were used by the banker, since such metrics are not uniformly defined and shareholders are therefore unable to assess the utility and legitimacy of the actual metrics without seeing the underlying components.

40.     With respect to the Management Projections beginning on Page 29, the Recommendation Statement fails to provide all of the financial projections provided by Portola and relied upon by the Financial Advisors for purposes of the fairness analyses.

41.     The Recommendation Statement omits entirely the: (i) individual drug segment cash flow projections on which Centerview based the discounted cash flow analyses that were

provided to and discussed with the Board on March 6, 2020 and March 27, 2020, and (ii) the

"certain downward adjustments" that were made to the Initial Long-Term Plan and upon which

Centerview based the revised discounted cash flow analysis that was provided to the Board on

March 27, 2020. *See, In re Celera Corp. S'holder Litig.*, Cons. C.A. No. 6304-VCP, 2012 Del.

Ch. LEXIS 66, at *85 (Del. Ch. Mar. 23, 2012), *aff'd in part, rev'd in part on other grounds*, 59

A.3d 418 (Del. 2012).

42.     With respect to both the Initial Long-Term Plan and the Updated Long-Term Plan,

the Recommendation Statement also does not provide projections for (i) adjusted depreciation &

amortization, (ii) capital expenses, (iii) changes in net working capital, (iv) the value of the

Company's NOL carryforwards, (v) stock-based employee compensation, or (vi) any other line

items used in deriving the projected after-tax unlevered free cash flows.

43.     The Recommendation Statement also omits material information regarding the

Financial Advisors' Fairness Opinion and the various valuation analyses performed to render that

opinion.   The description of the Fairness Opinion fails to include necessary underlying data,

support for conclusions, or the existence of, or basis for, underlying assumptions.

44.     With respect to Centerview's *Selected Public Company Analysis* beginning on page

35, the Recommendation Statement fails to disclose: (i) the full rationale and criteria that

Centerview relied on in selecting the companies as "relevant," (ii) whether Centerview subtracted

one-time upfront partnering payments in calculating the comparable company revenue multiples,

and (iii) the full rationale and basis that Centerview employed in selecting a range for 2021 revenue

multiples of 4.0x to 6.0x and a range for 2022 revenue multiples of 3.0x to 4.0x.

45.     With respect to Centerview's *Selected Precedent Transactions Analysis* beginning

on Page 36, the Recommendation Statement fails to disclose: (i) the full rationale and criteria that

Centerview relied on in selecting the transactions as "relevant," (ii) whether the "2021E Forward Revenue Multiple" and "2022E Forward Revenue Multiple" information in the table were actually the one- and two-year forward revenue multiples implied by the transaction, (iii) whether Centerview subtracted one-time upfront partnering payments in calculating the comparable transaction revenue multiples, and (iii) the full rationale and basis that Centerview employed in selecting a range for 2021 revenue multiples of 4.5x to 6.5x and a range for 2022 revenue multiples of 4.0x to 5.5x.

46.     With respect to Centerview's *Discounted Cash Flow Analysis* (DCF) beginning on Page 37, the Recommendation Statement fails to disclose: (i) the full rationale and basis for selecting a discount rate range of 9.5% to 11.5%, (ii) whether Centerview selected the same discount rate range in performing the sum-of-the-parts DCF analyses that were provided to the Board on March 6, 2020 and March 27, 2020, (iii) the rationale and basis for selecting a perpetuity decline rate range of (20.0%) to (30.0%), (iv) whether Centerview selected the same perpetuity decline rate range in performing the sum-of-the-parts DCF analyses that were provided to the Board on March 6, 2020 and March 27, 2020, and (v) a full sensitivity table based on the entire range of discount and perpetuity decline rates.  Without this information, it is impossible to determine whether the discounted cash flow analysis actually provides a reasonable range for the Company's intrinsic value.  Indeed, a banker can make any transaction seem "fair" simply by changing the inputs and assumptions to project and discount future cash flows below the present value of the merger consideration.

47.     With respect to the *Certain Updates* beginning on Page 38, the Recommendation Statement fails to disclose the unlevered free cash flow projections that were derived under Methodology 2.

## COUNT I
### (Against All Defendants for Violation of Section 14(e) of the Exchange Act)

65.     Plaintiffs incorporate each and every allegation set forth as if fully set forth herein.

66.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

67.     Defendants violated § 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the Tender Offer.  Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

68.     The Recommendation Statement was prepared, reviewed, and/or disseminated by Defendants.  It misrepresented and/or omitted material facts, including material information about the consideration offered to shareholders via the Tender Offer and the intrinsic value of the Company.

69.     In doing so, Defendants made untrue statements and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e).  The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Recommendation Statement, but nonetheless failed to obtain and

disclose such information to shareholders although they could have done so without extraordinary effort.

70.     The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable shareholder would consider them important in deciding whether to tender their shares.  In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to shareholders.

71.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

72.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiffs, and Plaintiffs will be deprived of her entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

**COUNT II**
**(Against all Defendants for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9, 17 C.F.R. § 240.14d-9)**

73.     Plaintiffs incorporate each and every allegation set forth as if fully set forth herein.

74.     Defendants have caused the Recommendation Statement to be issued with the intention of soliciting shareholder support of the Proposed Transaction.

75.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated

thereunder require full and complete disclosure in connection with tender offers.  Specifically,

Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security
> to accept or reject a tender offer or request or invitation for tenders
> shall be made in accordance with such rules and regulations as the
> Commission may prescribe as necessary or appropriate in the public
> interest or for the protection of investors.

76.     SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the

Exchange Act, provides that:

> Information required in solicitation or recommendation. Any
> solicitation or recommendation to holders of a class of securities
> referred to in section 14(d)(1) of the Act with respect to a tender
> offer for such securities shall include the name of the person making
> such solicitation or recommendation and the information required
> by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair
> and adequate summary thereof.

77.     In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's

directors to:

> Furnish such additional information, if any, as may be necessary to
> make the required statements, in light of the circumstances under
> which they are made, not materially misleading.

78.     The omission of information from a recommendation statement will violate

Section 14(d)(4) and Rule 14d-9 if other SEC regulations specifically require disclosure of the

omitted information.

79.     The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9

because it omits material facts, including those set forth above, that render the Recommendation

Statement misleadingly incomplete.  Defendants knowingly or with deliberate recklessness

omitted the material information identified above from the Recommendation Statement, causing

certain statements therein to be materially incomplete and therefore misleading.  Indeed, while

Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

80.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiffs, and Plaintiffs will be deprived of the right to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Tender Offer or taking any steps to consummate the Proposed Transaction, until the Company discloses the material information discussed above which has been omitted from the Recommendation Statement;

B.     Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiffs rescissory damages

C.     Directing the Defendants to account to Plaintiffs for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

18

Dated: June 1, 2020

**MONTEVERDE & ASSOCIATES PC**

By: _/s/ Juan E. Monteverde_

Juan E. Monteverde (JM-8169)
The Empire State Building 350 Fifth
Avenue, Suite 4405 New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**ADEMI & O'REILLY, LLP**
Guri Ademi
Jesse Fruchter
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com
        jfruchter@ademilaw.com